## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## KANSAS CITY DIVISION

| | |
|---|---|
| ROBBY BROWN, individually and on behalf of all others similarly situated, | Case No.: |
| *Plaintiff,* | **CLASS ACTION COMPLAINT** |
| *v.* | **JURY TRIAL DEMANDED** |
| ADTALEM GLOBAL EDUCATION, INC., a Delaware corporation, DEVRY UNIVERSITY, INC., a Delaware corporation, | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Robby Brown ("Brown" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, files this Class Action Complaint against Adtalem Global Education, Inc. ("Adtalem"), formerly known as DeVry Education Group, Inc., and DeVry University, Inc. ("DVU") (collectively referred to as "Defendants" or "DeVry") to, without limitation, obtain damages and restitution, and obtain a declaration that Defendants' actions were unlawful. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and on information and belief as to all other matters, including, *inter alia*, investigation conducted by and through his attorneys.

## NATURE OF THE ACTION

1. At all times relevant herein, Defendants jointly operated the for-profit school, DeVry University. DeVry provides hundreds of classes taught at locations throughout the country. Since at least 2008, Defendants have made numerous deceptive claims regarding their student employment and income statistics. Specifically, Defendants claim that 90% of their students

actively seeking employment had careers in their fields of study within six months of graduation (the "90% Placement Claim"). Similarly, Defendants systematically represented that DeVry University graduates obtained jobs with significantly higher incomes than graduates of other colleges or universities (the "Higher Income Claims").

2.  These claims are not meaningless statistics. Rather, as the Department of Education has recognized, for-profit institutions like DeVry use these misleading claims as critical selling points to get prospective students to enroll.[1] Using high-pressure sales tactics to leverage these statistics, DeVry is able to charge significantly more for its services than other universities,[2] even though its students—even those who graduate—are no more likely to land a job than those who didn't go to college.[3]

3.  This enrollment model is crucial to DeVry's success. Because DeVry derives the vast majority of its income from federal financial aid programs, it is incentivized to get as many students to enroll, take out loans, and make as many tuition payments as possible. If—and more likely, when—those students do not graduate or find jobs, the former students are stuck with crippling debt, while DeVry simply gets other unwitting prospects to buy into its 90% Placement

---

[1] Department of Education, Program Integrity: Gainful Employment, 79 Fed. Reg. 64890-01, 64890 (Oct. 31, 2014) ("[P]rograms are engaging in aggressive and deceptive marketing and recruiting practices. As a result of these practices, prospective students and their families are potentially being pressured and misled into critical decisions regarding their educational investments that are against their interests."); *see also* U.S. Gov't Accountability Office, GAO-10-948T, Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices (2010).

[2] 79 Fed. Reg. at 64907.

[3] Rajeev Darolia, *Do Employers Prefer Workers Who Attend For-Profit Colleges? Evidence from a Field Experiment*, National Center for Analysis of Longitudinal Data in Education Research (Aug. 2014), https://caldercenter.org/sites/default/files/WP-%20116.pdf; Julian T. Miller, *Program Integrity and the Implications of the Corporate Identity in Higher Education*, 7 Brook. J. Corp. Fin. & Com. L. 509, 526 (2013) (noting Department of Education's concern that "higher tuition costs at for-profit universities provide[] no return through gainful employment.").

*Brown v. Adtalem Global Education, Inc., et al.*
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 2 of 39
CLASS ACTION COMPLAINT

Claim and Higher Income Claims and enroll in those former students' places. Simply put, DeVry's business model is built on boosting its initial enrollment numbers, not its students' long-term success. The 90% Placement Claim and Higher Income Claims reflect this myopic focus.

4. In early 2016, it was publicly revealed that Defendants' 90% Placement Claim and Higher Income Claims were false. Unfortunately, tens of thousands of students and consumers reasonably relied on these claims and enrolled in DeVry, borrowing billions of dollars' worth of student loans to purchase educational services and products from Defendants, when—had they known the truth behind Defendants' claims—they would have paid substantially less for their enrollment or wouldn't have enrolled at all.

5. Plaintiff Brown, and the students and consumers he seeks to represent, are victims of DeVry's predatory practices. They read and heard DeVry's 90% Placement Claim and Higher Income Claims, and subsequently purchased Defendants' educational services and products in reliance on the truth and accuracy of these claims, unaware that they were false and untrue.

6. Accordingly, Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit and seeks damages and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in the possession of Defendants.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because: (a) at least one member of the putative Class is a citizen of a state different from DeVry; (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (c) the proposed Class consists of more than 100 Class Members; and (d) none of the exceptions under the subsection apply to this action.

8.      This Court has supplemental jurisdiction over the Missouri Merchandising Practices Act., Mo. Ann. Stat. § 407.010, *et seq*. ("MMPA"), and other state common law claims pursuant to 28 U.S.C. § 1367 (providing for supplemental jurisdiction over pendant state law claims).

9.      This Court has personal jurisdiction over Defendants because: (a) they are registered to, and in fact do, conduct business in Missouri; and (b) have sufficient minimum contacts in Missouri, or otherwise intentionally avail themselves of the markets within Missouri through the promotion, sale, marketing, and distribution of their products and services to render the exercise of jurisdiction by this Court proper and necessary.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because: (a) Plaintiff is a resident of, and domiciled in, this District; (b) Defendants conduct substantial business in this District; and (c) a substantial part of the events giving rise to Plaintiff's claims alleged herein occurred in this District.

## **PARTIES**

11.     Plaintiff Robby Brown is a natural person and citizen of the State of Missouri, residing in Kearny, Missouri.

12.     Defendant Adtalem is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 500 West Monroe Street, Chicago, Illinois. Adtalem transacts business throughout Clay County, the State of Missouri, and across the United States. Adtalem was previously known as DeVry Education Group, Inc., a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3005 Highland Parkway, Downers Grove, Illinois. At all times material to this action, acting alone or in concert with others, Adtalem, including when it was known as DeVry Education Group, Inc., has advertised, marketed, distributed, or sold educational products and services to

4

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 4 of 39

consumers and students in Missouri and nationwide and, with respect to the acts and practices of DVU that are described herein: (a) dominated and controlled DVU's acts and practices; (b) knew and approved of DVU's acts and practices; and (c) benefitted from DVU's acts and practices.

13.     Defendant DVU is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3005 Highland Parkway, Downers Grove, Illinois. At all times relevant herein, DVU was a subsidiary of Adtalem, formerly known as DeVry Education Group. DVU transacts business throughout the State of Missouri, and across the United States. At all times material to this action, acting alone or in concert with others, DVU advertised, marketed, distributed, or sold the educational products and services to consumers and students in the State of Missouri and throughout the United States.

14.     At all times mentioned in the causes of action alleged herein, each and every Defendant was acting in concert with, and/or was an agent and/or employee of each and every other Defendant. In performing the acts and/or omissions stated herein, each and every Defendant was acting within the course and scope of a common enterprise, and was acting with the consent and authorization of each of the remaining Defendants. All actions of each Defendant as alleged in the causes of action stated herein were ratified and approved by every other Defendant and/or its officers or managing agents.

## COMMON FACTUAL ALLEGATIONS

15.     Adtalem is a for-profit education company with a market capitalization of nearly $3 billion and total annual revenues approaching $2 billion, or $168,000 per employee. The marketing and sale of for-profit educational goods and services is big business, and Adtalem is one of the biggest.

5

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 5 of 39

16.     At all times relevant herein, Adtalem owned and operated DVU.[4] Together, as "DeVry," they collectively comprise approximately 60 campuses in the United States and an online division that offers 10 certificate, diploma, and degree programs with over 30 concentrations in health care, business, and technology.

17.     As a for-profit institution, enrollment growth is critical to DeVry's success for several reasons. First, DeVry's high attrition rate means that it needs to replace its income from tuition paid by students who enroll but subsequently leave its program. For example, DeVry's 2014 graduation rate for the 2008 first-time, full-time entering class to which the graduation rate applies was only 32%. (*See* Exhibit A, attached hereto). Increasing enrollment ensures that DeVry covers its tuition losses from those students that don't graduate.

18.     Second, nearly every student that enrolls provides a new revenue stream to DeVry in the form of federal loans. Historically, DeVry has derived nearly 80% of its revenues from Title IV federal education funds, such as Pell grants, Stafford loans, and Veterans Affairs education programs, which assist students in paying for higher education. According to the U.S. Department of Education, DeVry received more than $1 billion in taxpayer dollars through federal student aid in 2015 alone.[5]

19.     Finally, increasing enrollment rates—and thereby its bottom line—also ensures that

---

[4] Adtalem announced on or about December 5, 2017, that it had signed an agreement to transfer ownership of DeVry University and its Keller Graduate School of Management to Cogswell Education LLC. This transaction was recently completed in December 2018.

[5] To underscore that DeVry's focus is on the up-front enrollment of students, and not their long-term success, consider that DeVry students cumulatively hold $8.3 billion in student debt—the fourth highest debt volume of any higher education institution in America—and have a 2009 five-year cohort default rate of 43%. This means that approximately $3.6 billion in revenues that DeVry received from students in the form of federal student loans is now either in forbearance or in default. *See* Department of Education, Program Integrity: Gainful Employment, 76 Fed. Reg. 34386-01, 34387 (June 13, 2011) ("The revenues of these institutions are dependent on the number of students they enroll in their programs; they are not otherwise dependent on whether their students graduate, find jobs, and ultimately repay their loans.").

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 6 of 39

DeVry meets the revenue and profit projections that its investors expect. As a publicly-traded, for-profit education company, it must consistently show enrollment growth, which is a closely watched metric by Wall Street analysts.

20.     To ensure DeVry meets its enrollment goals, DeVry spends hundreds of millions of dollars each year (*e.g.*, $264 million in 2015) advertising, marketing, recruiting, and promoting DeVry's job placement and post-graduate income claims. To that end, DeVry employs a large sales and recruiting staff to promote its "graduate outcome" claims through a variety of mediums. In 2010, for example, DeVry's recruiting staff outnumbered its career counselors by a factor of ten.

21.     These recruiters are trained to use an approach called "the value proposition of the program," which emphasizes the value of the program against the cost to the student. For example, by emphasizing that a DeVry education is likely to get the student a job in his or her chosen field or a higher income when he or she starts, the high price of an education at DeVry is downplayed and pitched as a more reasonable investment. Critically, prospective students can only make informed choices about whether the benefits of the program outweigh its costs if the representations—the supposed "value" the education provides—are true.

22.     The "value" Defendants promised students in this case was based on Defendants' 90% Placement Claim and Higher Income Claim.

**Defendants' 90% Placement and Higher Income Claims Are Inaccurate and Misleading**

*Defendants' 90% Placement Claim*

23.     To recruit new students, DeVry made false, deceptive, and unfair claims about the job placement rates of its graduates, including without limitation in its 90% Placement Claim that 90% of DeVry graduates who were actively seeking employment had obtained jobs in their field

of study within six months of graduation. (*See* Exhibit B, attached hereto.)[6] In reality, the true statistics for DeVry's graduate outcomes are dismal, rendering DeVry's promotional and advertising statements false and misleading.

24.     To substantiate their promotional and advertising claims, Defendants use information they obtain from students about their majors, graduation dates, their employment, and DeVry's classifications of their employment status and from other third parties. Defendants used and manipulated these records to calculate the 90% Placement Claim.

25.     The data, records, and information used by Defendants to make the 90% Placement Claim do not support Defendants' claims. To the contrary, they show that the claims were falsified. Defendants improperly counted a substantial number of DeVry graduates as having been placed successfully (*e.g.*, those who were employed when they enrolled and who never actively participated in an employment search). Similarly, Defendants excluded a substantial number of graduates in the pool of those actively seeking employment who should not have been excluded.

---

[6] On January 27, 2016, the Federal Trade Commission ("FTC") filed a civil complaint (the "FTC Lawsuit") against DeVry in the United States District Court for the Central District of California alleging that certain of DeVry's 90% Placement and Higher Income Claims were false, deceptive, unfair, misleading, unsubstantiated, and illegal at the time they were made in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), as amended (the "FTC Act"). On January 27, 2016, DeVry received a Notice of Intent to Limit from the Department of Education ("DOE") Office of Federal Student Aid (the "January 2016 Notice"), based on a portion of its pending August 28, 2015 inquiry, informing DeVry of the DOE's intention to impose certain limitations on DeVry because of its statements regarding the post-graduation employment outcomes of DVU students. The DOE ultimately found that "After reviewing the information that DeVry provided, Federal Student Aid found that DeVry could not provide evidence to substantiate this [90% Placement] claim." Department of Education, *U.S. Department of Education Reaches Settlement with DeVry University Over Job Placement Claims*, Oct. 13, 2016, https://www.ed.gov/news/press-releases/us-department-education-reaches-settlement-devry-university-over-job-placement-claims. On March 14, 2016, the Department of Veterans Affairs (the "VA") suspended DeVry from participation in a program that identifies schools doing a good job of serving former troops in light of the FTC Lawsuit accusing the for-profit chain of misleading consumers about the employment and earnings of its graduates in advertisements. Several other state Attorneys General have similarly launched investigations into DeVry's representations.

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 8 of 39

For example, Defendants count graduates who did not obtain a job as a result of obtaining a degree from DeVry, and include DeVry graduates who after graduation continued with the same job they had when they enrolled in DeVry.

26. Defendants also unreasonably count jobs that employers, industry experts, graduates, and consumers would not reasonably consider to be in the graduate's field of study and exclude students as "inactive" who were in fact seeking jobs (*i.e.*, reviewing jobs in the DeVry database, attending job interviews, attending DeVry career fairs, actively applying for positions, and actively following up with prospective employers). The actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%. [7]

27. Following the resolution of multiple lawsuits initiated by regulatory bodies against DeVry, Defendants were ultimately enjoined from making the 90% Placement Claim as part of their advertising. DeVry correspondingly reduced its tuition prices for new students applying to certain bachelor's degree programs by as much as 20%, and began phasing out other programs,

---

[7] Many of the graduates themselves do not consider themselves as employed in their field of study when reporting to DeVry, but Defendants misrepresent them as employed in their field, including without limitation in the class of 2012: (1) graduates with degrees in technical management who were working as (a) a rural mail carrier (human resources concentration); (b) a yard salesman at a nursery (business information systems concentration); (c) a sales associate at Macy's (general technical concentration); (d) a driver delivering rain gutters for a construction services company; (e) a data entry specialist for a radio station (human resources concentration); and (f) unpaid volunteers at medical centers (human resources management and health services management concentrations); (2) a graduate with a degree in business administration (health services management concentration) working as a server at the Cheesecake Factory); (3) a graduate with a degree in business administration (health care management concentration) working as a car salesman; (4) a graduate with a degree in business administration (accounting concentration) working as a secretary at a prison; and (5) graduates with various degrees working as customer service representatives. Thus, even in situations where DeVry relies on self-reported employment data—i.e., a person reports finding a job as a mail carrier—DeVry nonetheless may misclassify that data by considering it a job within a student's field of study—i.e., misclassifying the mail carrier job as within that student's technical management degree field—to bolster its 90% Placement Claim.

acknowledging that it was facing increasing pressure to lower its prices facing increased competition and declining enrollment.

### Defendants' Higher Income Claims

28.     DeVry has also made false, deceptive, and unfair Higher Income Claims about the median income levels of its graduates. Defendants have made these claims repeatedly and in a systematic manner since at least 2008. Defendants have made the material representation that seeking an education at DeVry statistically results in higher incomes than comparative programs.

29.     Defendants falsely represented that its graduates could earn more than four-year college students starting their careers. Specifically, Defendants publicly represented that, one year after graduation, DeVry students who earned bachelor's degrees on average earn 15% more than graduates from other colleges and universities. (*See* Exhibit B.) The true facts are that DeVry students do not earn more one year after graduation than four-year college students do in the same one-year after they graduate.

30.     In using and manipulating false graduate outcome information to make their 90% Placement Claim, Defendants also falsely misrepresented and artificially inflated the average annual compensation of its graduates by: (a) improperly counting a substantial number of DeVry graduates as having been placed successfully (*e.g.*, those who were employed when they enrolled, who never actively participated in an employment search, and who generally earn more than graduates who accept employment after graduation); (b) improperly excluding a substantial number of graduates in the pool of those actively seeking employment, who should not have been excluded, and who had zero income from education-related positions; (c) improperly counting graduates who did not obtain a job as a result of obtaining a degree from DeVry; and (d) improperly including DeVry graduates who after graduation continued with the same job they had when they

10

Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 10 of 39

enrolled in DeVry, and who generally earn more than graduates who accept employment after graduation. (*See* Exhibit B.)

31.     In order to further bolster their deceptive Higher Income Claims, in 2012, Defendants hired a third-party company to obtain income data from students who had graduated from DeVry and other schools in 2010. DeVry then used and manipulated the data for marketing purposes. In using the Higher Income Claims in its advertisements and sales pitches, DeVry knew, or should have known, the reliability of the conclusions and information contained in the income report was contradicted by its own data. For instance, the third-party information did not account or adjust for material differences in age, experience, and field of study.

32.     Further, DeVry's own income statistics that it routinely collected annually and directly from thousands of its own graduates materially differed from the third-party report, which consisted of a sample size of only several hundred individuals per year. As such, DeVry was on notice that the third-party data was not reliable or representative. And Defendants knew, or should have known, the conclusions and information contained in the income report were false because the methods and methodology of the survey that underlay the income report were questionable.

33.     Due to the flaws in the third-party survey, Defendants' reliance on the third-party data for its Higher Income Claims was unreasonable and Defendants knew, or should have known, that their Higher Income Claims and representations were false and unreliable. Indeed, based upon internal and external data, DeVry knew that its graduates did not in fact earn significantly more than graduates from all other schools combined.

**Defendants Widely Disseminated the 90% Placement and High Income Claims**

34.     Since at least 2008, DeVry has represented, expressly or by implication, in television commercials, on its websites, in telephone and face-to-face sales pitches with prospective students, in brochures and print advertisements, in social media advertisements, in

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 11 of 39

radio ads, and in other advertising and promotional materials two specific claims: (a) as a result of obtaining a DeVry degree, 90% of its graduates, from a specific year (*e.g.*, 2012) or during a specific period (*e.g.*, since 1975 or "for more than 30 years") who were actively seeking employment obtained new jobs in their fields of study within six months of graduation; and (b) DeVry's graduates earn more than graduates from other colleges and universities as a result of obtaining their degrees from DeVry.

### *Defendants Engaged in False Advertising Via the Internet, Print Media, Television, and Radio*

35.     Since at least 2008, Defendants have made their 90% Placement Claim in numerous television advertisements in both English and Spanish. These advertisements have run on national broadcast, satellite, and cable channels and stations, and some have run on DeVry's YouTube channel.

36.     Defendants' statements, made verbally and/or in writing, included: (a) "In 2012, 90% of DeVry University grads actively seeking employment had careers in their field in six months."; (b) "90% of our grads actively seeking employment had careers in 6 months."; (c) "Join the 90%. Learn how at devry.edu."; (d) "The offer letter. If you're going to college, or back to college, that's your bull's-eye. It is for DeVry University students. In fact, for more than thirty years, 90% of all graduates in the active job market had careers in their fields within six months. 90%."; (e) "This is the guy ready for a great career in technology. 90% of our grads actively seeking employment had careers in 6 months."; and (f) "90% of DeVry University grads actively seeking employment had careers in their field in six months. Learn how at devry.edu."

37.     Since at least 2008, Defendants have made their 90% Placement Claim and Higher Income Claims on various DeVry webpages, including without limitation, on the DeVry website, at www.devry.edu.

38.     Examples of the claims made on such webpages include:

*Brown v. Adtalem Global Education Inc., et al.*
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 12 of 39
CLASS ACTION COMPLAINT

- **"Excellent employment results.** Nobody wants to go to college and just be a number . . . unless they're numbers like these. Each year, thousands of our grads find themselves right where they want to be – employed in their fields of study.";

- **"Do DeVry University graduates get good jobs?** Employers want DeVry University graduates. More than 90% of our new graduates quickly land jobs in their fields of study within six months of graduation (learn more). This is a true testament to the fact that DeVry University teaches what companies are looking for. . . . DeVry University graduates leave school well-prepared to enter the workforce and begin contributing immediately."; and

- **"Outstanding Career Services** - In addition to a relevant education and a highly respected degree, DeVry University offers invaluable career services that have helped thousands of students begin rewarding careers in their fields. The proof is the numbers. Since 1975, 265,869 undergraduate students have graduated from DeVry and 90% of those in the active job market were employed in career related positions within six months of graduation."

39.     Defendants have also disseminated promotional representations through DeVry's public Twitter page at twitter.com/DeVryUniv. For example, on September 14, 2009, DeVry tweeted, "For over 30 years, 90% of all DeVry graduates in the active job market had careers in their fields within six months: http://bit.ly/hyYns." And on July 29, 2013, it tweeted, "90% of #DeVry grads active in the job market find employment in their field of study within 6 months. @DeVryUniv president Dave Pauldine."

40.     Defendants have made similar 90% Placement Claims in print advertisements, handouts to prospective students, brochures, and academic catalogs. In the 2008–2009 DeVry Academic Catalog, DVU President David J. Pauldine represented:

> [S]ince 1975, DeVry has graduated more than 230,000 students at the undergraduate level. Of graduates in the active job market, 90 percent were employed in career-related positions within six months of graduation. It's no wonder we say with conviction that at DeVry, we major in careers.

In the 2009–2010 DeVry Academic Catalog, Mr. Pauldine represented:

Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 13 of 39
*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

For over 30 years, of DeVry graduates in the active job market or already employed, 90 percent have enjoyed careers in their field of study within six months of graduation.

### *Defendants Engaged in False Advertising Via Internal Sales Pitches and Slide Shows*

41.     DeVry's marketing and sales involve both inbound and outbound campaigns. DeVry's inbound campaign involves disseminating promotional and advertising materials to generate phone calls to DeVry from prospective students, while DeVry's outbound campaign involves DeVry sales personnel making "cold" calls and lead-generated calls to prospective students.

42.     Through either method, prospective DeVry students typically have multiple conversations with DeVry sales representatives that follow set and predetermined scripts. During the course of these phone calls, Defendants make statements and representations as set forth herein to induce prospective students to enroll for a DeVry education program. These scripts were centered around the 90% Placement Claim and Higher Income Claim, and were purportedly approved by Defendants' upper management for use in recruitment conversations.

43.     Since at least 2013, DeVry's sales staff have been trained to inform prospective students via written scripts that "The DeVry University difference includes outstanding career outcomes—In 2012, 90% of DeVry University grads actively seeking employment had careers in their field within six months of graduation."

44.     Prospects are invited to one or more interviews that take place either in person on a DeVry campus or by telephone. Prospective students who are interested in attending a DeVry campus are invited to take a tour followed by an interview with a DeVry "Admissions Advisor." Likewise, prospective students for an online degree are invited to have one or more telephonic interviews with an Admissions Advisor.

14

45.     Although titled "Admissions Advisors" (or "enrollment advisors," "financial advisors," or "enrollment counselors"), an internal document makes clear the job function of these DeVry employees: "This is a sales position." As one salesman (who was told to represent himself as a "military adviser" to veterans) said, it was critical to get "asses in classes."

46.     During the campus tour, some prospects are fed lunch, shown a graduation uniform, or photos of a mock graduation are taken with the prospects wearing the graduation uniform. For the interview stage of the sales pitch, Defendants have provided the Admissions Advisors and salespeople with a training guide, scripts, and other guidelines instructing the Admissions Advisor on how to pitch the prospect. DeVry Admissions Advisors are also armed with a PowerPoint slide presentation to use during the interview. When the interview takes place by telephone, the prospective student may be directed to a website that allows the prospect to go through a slide presentation with the Admissions Advisor.

47.     DeVry's Admissions Advisors represent during the interviews with prospective students that one of the benefits of obtaining a DeVry degree is that, as a result of attaining that degree, 90% of DeVry graduates obtain jobs in their field soon after graduating. The training guide and scripts instruct the Admissions Advisor to tell the prospect, "[a]s a result of these types of career assistance our graduates have shown excellent career results, let's take a look at those." The prospective student is then immediately shown a slide on DeVry's website entitled, "Excellent Employment Results."

48.     This slide includes, without limitation, the following text: "In 2012, 90% of DeVry University graduates from all programs who actively sought employment had careers in their field of study within six months of graduation. Within that same population: 83% of associate degree graduates had careers in their field—92% of bachelor's degree grads had careers in their field."

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

49.     The Admissions Advisors are instructed to "[r]ead the career statistics on the screen verbatim" and to click a link to access "employment statistics." If the interview is conducted in person, the Admissions Advisor provides a paper copy of this information to the prospect.

50.     DeVry Admissions Advisors are told to respond to employment assistance questions from the prospect with a statement that, "DeVry offers career services that include assistance with job searches, resume preparation, practice interviews, career fairs, etc. These services are very successful, as evidenced by our employment statistics."

51.     The Admissions Advisors are also instructed to represent to prospects that one year after graduation, DeVry University grads report earning more than the median earning reported by all other graduates, including the claim that those earning bachelor's degrees would earn 15% more than their peers. DeVry Admissions Advisors are also instructed to ask prospects, "How do you think having a 15% higher median earning helped those students?"

### *DeVry Executives Made False Statements*

52.     In addition to the misrepresentations made by DVU President David Pauldine, in DeVry Education Group's August 8, 2013 fourth quarter 2013 earnings call, Chief Executive Officer Daniel Hamburger stated, without qualification:

> A recent Gallup poll found that the factor adult Americans say is most important in selecting a college is the percent of graduates who find a good job. And this is what DeVry University does. *The latest numbers are in, and DeVry University's employment statistics increased more than 90%. 90% of our graduates in the active job market are employed in their field of study within 6 months of graduation, and they're earning an average of over $43,500.* That's higher than the median family household income of our students before they enrolled at DeVry University. [Emphasis added].

53.     Similarly, the core focus of DeVry's 90% Placement Claim and Higher Income Claims is demonstrated in a "Letter to Shareholders" addressed to "Fellow Owners, Students, Colleagues, and Friends" written on or about August 29, 2013, wherein Chief Executive Officer Hamburger stated:

16

*Brown v. Adtalem Global Education, Inc., et al.*
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 16 of 39
CLASS ACTION COMPLAINT

The best measure of our quality is the successful outcomes that our students achieve. Notably, 90 percent of DeVry University's 2012 graduates active in the job market were employed in their fields of study within six months of graduation, earning an average of more than $43,500 annually.

He went on to represent:

PayScale recently validated the ROEI [return on educational investment] of DeVry University, ranking three campuses in the top 100 list of PayScale's annual College Return on Investment Report.

54.     DeVry's emphasis on its 90% Placement Claim and Higher Income Claims is also demonstrated in its 10-K filing with the U.S. Securities and Exchange Commission ("SEC") for its fiscal year ending June 30, 2013, where DeVry stated:

DeVry University's highly integrated brand initiative *focuses on the university's graduate employment success,* while emphasizing DeVry University as an accredited, highly-respected academic institution. The brand campaign is grounded in ongoing in- depth consumer, marketplace and brand research, and leverages a number of channels, including broadcast, print and Internet advertising, public relations, and social media, as well as local marketing efforts." [Emphasis added].

55.     DeVry went on to represent:

One measure of success is the employment outcomes of DeVry University graduates. Each year, thousands of DeVry University graduates have started careers in their chosen fields within 6 months or less of their graduation. Ninety percent of DeVry University's calendar 2012 graduates in the active job market were employed in their fields of study within six months of graduation at an average salary of $43,539. These statistics include graduates of associate and bachelor's degree programs and those who were already employed in their field of study.

## PLAINTIFF BROWN'S EXPERIENCE

57.     Plaintiff Robby Brown is a resident of Kearney, Missouri. Since at least 2010, Plaintiff had seen DeVry's television ads and heard DeVry's radio ads touting their 90% Placement and Higher Income Claims as described in Paragraphs 35–37. In or around the first and second quarters of 2010, Plaintiff Brown received several telephone calls from DeVry, wherein the sales person recited a sales pitch touting DeVry's 90% Placement and Higher Income Claims that were materially identical to the pitch described in Paragraphs 42–44.

*Brown v. Adtalem Global Education, Inc., et al.*
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 17 of 39
CLASS ACTION COMPLAINT

58.     Plaintiff Brown went to DeVry's website where, in addition to the ads he had seen on television and heard on the radio, and the representations made to him in the phone calls, he viewed the 90% Placement and Higher Income Claims in writing that were substantially similar to the representations described in Paragraphs 38–40. Plaintiff was also mailed brochures and other promotional material containing the 90% Placement and Higher Income Claims as described in Paragraph 41. After he reviewed these brochures, he revisited DeVry's website during the second quarter of 2010, where he again saw the 90% Placement Claim and Higher Income Claims. At the time, Plaintiff was starting the enrollment process to attend Centric College.

59.     In or around the second quarter of 2010, Plaintiff Brown spoke on the telephone between five and eight times with one or more DeVry "Financial Advisors," including without limitation Dale Masteas and Chris Dunlap, who repeated the 90% Placement and Higher Income Claims and assured him not to worry about the higher cost of the DeVry's education program because—as evidenced by the 90% Placement and Higher Income Claims—it was superior to an education from Centric and would be "all covered by grants."

60.     On or about May 21, 2010, Plaintiff Brown met in person with Admissions Advisor Chris Dunlap who gave him the sales pitch, brochures, and a computer presentation substantially similar to the pitch described in Paragraphs 47–52 that reiterated the 90% Placement and Higher Income Claims. Between May 2010 and October 2010, Plaintiff Brown also met in person with Dale Masteas and other DeVry representatives who repeated the 90% Placement Claim and Higher Income Claims through verbal representations and written brochures. Dunlap and Masteas told Mr. Brown that DeVry graduates were in demand from large technology employers who hired DeVry's graduates and supported DeVry's student programs. Mr. Dunlap told Mr. Brown employers hired DeVry graduates before and above graduates from other schools.

18

*Brown v. Adtalem Global Education, Inc., et al.*
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 18 of 39
CLASS ACTION COMPLAINT

61.     Mr. Masteas stated to Mr. Brown that although Defendants' tuition is considerably higher than other post-secondary institutions, including the Centric school Plaintiff Brown was considering, it would be of greater value and therefore superior to any other education Mr. Brown might be considering. Mr. Masteas then informed Mr. Brown that upon completion of a two-year Network Systems Administration degree program, he could make at least $120,000 per year. Based on the false and misleading 90% Placement Claim and Higher Income Claims, Plaintiff Brown believed he would enjoy superior earning power of at least $120,000 per year, and be in higher demand in the job market.

62.     Mr. Brown was told that if he hurried, he could start his education immediately in the Summer 2010 session. Otherwise, he would have to wait two months to get started. Mr. Brown was told the sooner he started, the sooner he could start making money in his new career. In reliance on DeVry's misrepresentations, Plaintiff Brown signed up and enrolled at the Kansas City school of DeVry as a full-time student pursuing an associate degree in Network Systems Administration.

63.     Plaintiff Brown, in reliance on DeVry's false and deceptive 90% Placement Claim and Higher Income Claims, had enrolled and paid DeVry approximately $16,579 in tuition, comprised of student loans which were paid directly to and converted by DeVry for its own use, plus interest, as well as paying for other related DeVry education products such as books and supplies, including instruction on DeVry's website. The prices for these products and services were significantly higher than what he would have paid for other similar post-secondary educational programs, but he believed they were worth it based on the 90% Placement Clam and Higher Income Claims. Had he known these claims were in fact false, he would have paid less for these products and services, or would not have enrolled at all.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this action pursuant to pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Members of the "Class," defined as:

**Class**: All students who purchased or otherwise paid for and received any part of a DeVry education program while residing in or attending a DeVry campus located in the State of Missouri.

65.     Additionally, Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and all Members of the "DOE Borrower Subclass," defined as:

**DOE Borrower Subclass**: All Members of the Class who purchased or otherwise paid for and received a DeVry education program while residing in or attending a DeVry campus located in the State of Missouri with direct student loan proceeds from the United States Treasury, and administered by the federal Department of Education.

66.     The Classes described in this Complaint may be jointly referred to as the "Class" and proposed Members of the Classes may be jointly referred to as "Class Members."

67.     The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

68.     Plaintiff and the Class Members satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 23 of the Federal Rules of Civil Procedure.

69.     **Numerosity and Ascertainability**: The exact number of Class Members is unknown and is not available to Plaintiff at this time, but individual joinder in this case is

impracticable. The Class likely consists of tens, if not hundreds, of thousands of individuals. Class Members can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other consumer unlawful trade practices and class action controversies.

70.     **Typicality**: Plaintiff's claims are typical of the claims of other Class Members, in that Plaintiff and the Class Members sustained damages all arise out of Defendants' wrongful conduct and misrepresentations, false advertising, and unlawful practices, and Plaintiff and the Class Members sustained similar injuries and damages as a result of Defendants' uniform illegal conduct.

71.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff have no interests that conflict with or are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

72.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not necessarily limited to the following:

    a.     Whether Defendants failed to disclose that Defendants' education programs, products, and services were of a lower quality and value than, and not as, expressly represented, warranted, promised, and covenanted;

    b.     Whether Defendants had a duty to disclose the truth about its 90% Placement Claim and Higher Income Claims in connection with the DeVry education program and services;

    c.     Whether Defendants knew or should have known their practices and representations related to the marketing, labeling and sales of the education program, products, and services were false, misleading, or confusing;

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

d.    Whether Defendants are liable for negligence or gross negligence;

e.    Whether Defendants' misrepresentations and omissions about its 90% Placement Claim and Higher Income Claims in connection with the DeVry education program, products, and services were likely to deceive, confuse, or create a misunderstanding;

f.    Whether Defendants' represented their products and services had characteristics, uses, or benefits which they do not have;

g.    Whether Defendants' represented their products and services were of a particular standard, quality, or grade that were actually of another;

h.    Whether Defendants' advertised their products and services with intent not to sell them as advertised;

i.    Whether Defendants' conduct, practices, and representations related to the marketing, advertising, labeling, and sales of the DeVry education program and services were unfair, fraudulent, deceptive, confusing, misleading and/or unlawful in any respect, thereby violating the MMPA, and other applicable state laws;

j.    Whether Defendants knew or should have known their representations were false;

k.    Whether Defendants had a duty to Plaintiff and the Class to disclose the true nature of their products and services;

l.    Whether Defendants falsely represented that their products and services were of a certain standard, quality, and grade, when in fact, they were not;

m.    Whether Defendants concealed material information regarding the true characteristics and nature of their products and services;

n.    Whether Defendants collected, took, or received monies from student loan proceeds in Defendants' possession and belonging to Plaintiff and the Class, and wrongfully converted such monies to their own use and benefit;

o.    Whether Plaintiff and the Class were damaged as a proximate cause or result of Defendants' breaches;

p.    Whether Defendants have been unjustly enriched as a result of the conduct complained of herein; and

q.    Whether Plaintiff and the Class are entitled to rescission, restitutionary, declaratory, or other relief.

73.    **Superiority**: This case is also appropriate for class certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy, as joinder of all parties is impracticable. The damages suffered by the individual Class Members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the Class Members to obtain effective relief from Defendants' misconduct. Even if Class Members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## COUNT I
## Fraudulent Misrepresentation
## (On Behalf of Plaintiff and the Class)

74.     Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

75.     The elements of the tort of fraudulent misrepresentation are: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or his or her ignorance of the truth, (5) the speaker's intent that the representation should be acted upon by the hearer in a manner reasonably contemplated, (6) the hearer's ignorance of the representation's falsity, (7) the hearer's reliance on the representation's truth, (8) the hearer's right to rely on the representation, and (9) injury to the hearer proximately caused by his reliance.

76.     Defendants intentionally and knowingly made the 90% Placement Claim and Higher Income Claims, which were false, untrue statements of material facts to Plaintiff and the Class Members concerning the education program.

77.     Defendants intentionally and knowingly misrepresented the aforementioned untrue or misleading facts to Plaintiff and the Class Members with the intent to induce them to enroll and purchase an education program, products, and services from Defendants.

78.     Defendants' representations are false and misleading, because, without limitation: (a) the actual percentage of DeVry graduates who, at or near the time they graduated, found jobs that could be reasonably considered "in their field" is in fact significantly and materially smaller than 90%; and (b) Defendants' own statistics showed that graduates of DeVry did not have any higher income than graduates from other schools and that such claim was false, misleading, deceptive and incomplete.

79.     Defendants knew that their representations were false and/or misleading when made, or made the representations and suggestions recklessly and without regard for their truth. Plaintiff and the Class Members have suffered damages and injury in fact the form of, without limitation, liability for student loans, tuition, and other payments for their education program, products, and services.

80.     Plaintiff and the Class Members justifiably relied on the 90% Placement Claim and Higher Income Claims, which were specific representations about Defendants' education programs. Plaintiff and the Class Members and would not have enrolled in Defendants' education programs or paid for any other of Defendants' services, or would not have paid as much for them, had they known the truth about the 90% Placement Claim and Higher Income Claims.

81.     Neither Plaintiff nor the Class Members did discover, nor could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations, including the ten-year statute of limitations for fraud.

82.     As a direct and proximate result of Defendants' misrepresentations, Plaintiff and the Class Members have suffered injury, including but not limited to, monetary loss in connection with borrowing funds to enroll, and the purchases of Defendants' products and services they would not have purchased absent DeVry's false representations.

83.     Accordingly, Plaintiff and the Class are entitled to, and hereby seek, rescission, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, pre-and post-judgment interest at the applicable legal rate as permitted by law, and further equitable relief as this Court deems appropriate.

## COUNT II
**Fraudulent Concealment**
**(On Behalf of Plaintiff and the Class)**

84.     Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

85.     Defendants were in a position of superiority to Plaintiff and the Class Members and as such had the duty and obligation to disclose to Plaintiff the true facts and their knowledge concerning their products and services, and about the 90% Placement Claim and the Higher Income Claims, and the fact that such representations were false, misleading, and untrue. Additionally, Plaintiff and the Class Members did not know of the concealed facts prior to purchasing a DeVry education program and related services, nor could they reasonably be expected to learn or discover such concealed facts prior thereto.

86.     All of these facts were material to Plaintiff and the Class Members' decision to borrow money and enroll in Defendants' educational program in that they are facts a reasonable person would have considered important in deciding whether or not to do so.

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

87.     Defendants intentionally and knowingly concealed the aforementioned material facts from Plaintiff and the Class Members with the intent to induce them to purchase its education program and related products and services.

88.     Defendants continued to conceal the defective nature of their product and services even after Class Members began to complain about, and report the problems with, Defendants products and services. Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, that DeVry concealed the true facts behind its 90% Placement Claim and Higher Income Claim until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations.

89.     Plaintiff and the Class justifiably and reasonably relied on Defendant to disclose the truth about the 90% Placement Claim and Higher Income Claims. Plaintiff and the Class justifiably relied on the facts as they knew them at the time, and as a direct and proximate result of Defendants' fraudulent concealment of material facts, Plaintiff and the Class Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with purchases of the education program and related services they would not have purchased absent Defendants' concealment.

90.     Had they known of the concealed information, Plaintiff and the Class Members would not have purchased the education program and related services, nor would not have paid as much therefor.

91.     Accordingly, Plaintiff and the Class Members are entitled to, and hereby seek, rescission, actual damages, punitive damages, reasonable attorneys' fees and costs, pre-and post-judgment interest as allowed by law, and any and all further equitable relief that this Court deems appropriate.

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

## COUNT III
### Violation of the Missouri Merchandising Practices Act
### Mo. Ann. Stat. § 407.010, *et seq.*
### (On Behalf of Plaintiff and the Class)

92.     Plaintiff and the Class Members incorporate the foregoing allegations as if fully set forth herein.

93.     The Missouri Merchandising Practices Act (the "MMPA") provides, in part that:

[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the State of Missouri, is declared to be an unlawful practice . . . .

Mo. Ann. Stat. § 407.020.1.

94.     The enabling regulations for the MMPA define an "unfair practice" as conduct that (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes a risk of substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; or (6) is unlawful. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.

95.     Under the MMPA, the term "merchandise" is broadly defined to include "any objects … or services." Mo. Ann. Stat. § 407.020.4.

96.     The MMPA authorizes private causes of action, and class actions. Mo. Ann. Stat. §§ 407.025.1 and 407.025.2.

97.     Plaintiff and Class Members purchased Defendants' products and services primarily for personal, family, or household purposes within the meaning of the MMPA.

98.     Defendants' unfair and deceptive acts and/or omissions as set forth herein are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers—including Plaintiff and Class Members—regarding Defendants' products and services.

99. Defendants engaged in deceptive and unfair acts in connection with its marketing, promoting, advertising, and selling DeVry's products and services, including by representing that: (a) as a result of obtaining a DeVry degree, 90% of DeVry graduates from a specific year who were actively seeking employment landed or obtained new jobs in their field of study within six months of graduation; (b) after graduation the average or median earnings of DeVry graduates is higher than the average or median earnings of graduates from all other colleges and universities; and (c) DeVry bachelor's degree graduates specifically earn up to 15% more than graduates from other colleges and universities. Each of these representations are false and/or misleading and constitute a deceptive act or practice in violation of the MMPA.

100. Relatedly, Defendants' concealment, suppression, or omission of material facts as alleged herein—including concealing the true facts and data underlying the 90% Placement Claim and Higher Income Claim and that these claims were false—also constitute unfair, deceptive, and fraudulent business practices within the meaning of the MMPA. Defendants willfully and intentionally failed to disclose one or more important and material facts that were only known to them and that Plaintiff and the Class Members could not have discovered; and/or Defendants actively concealed one or more important and material facts from Plaintiff and the Class Members and/or prevented them from discovering such fact or facts.

101. Defendants' actions in connection with the sale and distribution of their products as set forth herein evidences a lack of good faith, honesty in fact, and observance of fair dealing so as to constitute unconscionable—and unfair—commercial practices.

102. Defendants made these representations and omissions with the intent that Plaintiff and Class Members purchase Defendants' products and services, which did not have the attributes and qualities represented. It was reasonably foreseeable that the concealment, suppression, or omission of the aforementioned material facts would, and in fact did, deceive a substantial portion

of the public, including the Class Members, into believing the DeVry products and services had the attributes and qualities of represented by the 90% Placement Claim and Higher Income Claims.

103. Defendants either knew, or should have known, that the DeVry products and services did not have the attributes and qualities regarding the 90% Placement Claim and the Higher Income Claims, which would result in harm and injury in fact.

104. As a direct and proximate cause of Defendants' unfair and/or deceptive practices, Plaintiff and Class Members have been injured and suffered ascertainable loss of money and damages. Had Plaintiff and Class Members known the true nature, attributes, and qualities of the DeVry products and services, they would not have purchased them or would have paid less for them. Plaintiff is entitled to actual damages, including but not limited to the difference in value between the DeVry products and services as represented versus as delivered, equitable and declaratory relief, punitive damages, treble damages, costs and reasonable attorney's fees.

105. Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations, including the five-year statute of limitations for the MMPA.

<u>**COUNT IV**</u>
**Negligence**
**(On behalf of Plaintiff and the Class)**

106. Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

107. In providing an education program to Plaintiff and the Class Members, Defendants owed a duty to exercise reasonable care to make full, fair, and adequate disclosure in connection with the characteristics, uses, benefits, standards, quality, attributes, and nature of their education program,

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT
Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 29 of 39

including with respect to the 90% Placement Claim and Higher Income Claim. This duty included, among other things, taking reasonable measures to protect the rights of the Class Members in compliance with applicable law, including, but not limited to, procedures and policies to supervise, restrict, limit, and determine the accuracy and truthfulness of their claims, materials, and advertising in connection with its education program.

108.    In providing its education program to Plaintiff and the Class Members, Defendants owed a duty to exercise reasonable care regarding and when making the 90% Placement and Higher Income Claims, and representations and omissions in connection with the characteristics, uses, benefits, standards, quality, attributes, and nature of the education program.

109.    Additionally, DeVry had a duty to timely disclose to and/or warn Plaintiff and the Class Members that their 90% Placement Claim and Higher Income Claims were and are false and misleading. Timely disclosure was necessary and appropriate so that Plaintiff and the Class Members could have, among other things, timely pursued and exhaust available remedies, and undertake appropriate measures to prevent or mitigate the harm from the 90% Placement Claim and Higher Income Claims, including without limitation in connection with borrowing student loans.

110.    Defendants' advertising and promotional materials were intended to affect Plaintiff and the Class Members. Defendants were aware that by representing that their claims, materials, and advertising about the education program were accurate, that it had a responsibility to take reasonable measures to ascertain and fully, fairly, and adequately disclose the accuracy and truthfulness thereof.

111.    It was foreseeable that if Defendants did not take reasonable measures to ascertain and ensure the accuracy and truthfulness of their representations, Plaintiff and the Class Members would borrow money through student loans to purchase a DeVry education program. Defendants should have known to take precautions to ensure their 90% Placement and Higher Income Claims, advertising, materials, and representations were accurate.

112.     DeVry breached its duty to exercise reasonable care in connection with the accuracy of its 90% Placement Claim and Higher Income Claims by, among other examples, (a) failing to timely warn or notify Plaintiff and the Class about the misrepresentations, (b) failing to issue any warnings to its current and former students affected by the misrepresentations, (c) failing to remove these representations from the marketplace or to take other appropriate remedial action, and (d) failing to have reasonable safeguards in place to ensure the claims were accurate. Defendants knew or should have known that their products and services were not as warranted and represented by Defendants.

113.     But for Defendants' failure to implement and maintain adequate measures to ensure the accuracy of their claims and materials in connection with their education program, and their failure to monitor their policies and procedures to identify inaccurate, untruthful, and unlawful claims, Plaintiff and Class Members would not have taken out student loans, would not have purchased a DeVry education program for the price they paid, if in fact they would have purchased the education program at all, and would not be at a heightened risk of being financially unable to repay, or defaulting on, their student loans in the future.

114.     Neither Plaintiff nor other Class Members contributed to the unlawful conduct set forth herein, nor did they contribute to Defendants' making of the 90% Placement Claim and Higher Income Claims, nor to the insufficient policies, procedures, and measures which were omitted and led to the failure to ensure the accuracy and truthfulness of Defendants' claims in connection with the nature of the education program, products, and services.

115.     Defendants' negligence was a substantial factor in causing harm to Plaintiff and the Class Members. As a direct and proximate cause and result of Defendants' failure to exercise reasonable care and use reasonable measures to ensure the accuracy of their 90% Placement and Higher Income Claims, Plaintiff and the Class Members have suffered actual injury-in-fact and economic

damages, including incurring student loan debt and paying education related costs that they would not have otherwise incurred and paid.

116.     Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations, including the five-year statute of limitations for negligence.

117.     Plaintiff and the Class seek compensatory damages, the costs of suit and attorneys' fees, and other and further relief as is deemed just and proper as further set forth below.

## COUNT V
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the DOE Borrower Subclass)

118.     Plaintiff and the DOE Borrower Subclass Members incorporate the above allegations as if fully set forth herein.

119.     DeVry's 2014 10-K admits:

"Specialized staff at DeVry's home office review, interpret, and establish procedures for compliance with regulations governing financial assistance programs and processing financial aid applications. Financial assistance programs are required to be administered in accordance with the standard of care and diligence of a fiduciary."

120.     Defendants owed Plaintiff and the DOE Borrower Subclass Members a fiduciary duty to make sure that government financial assistance programs, including without limitation student loans, and the processing of financial aid applications, were administered in accordance with the standard of care and diligence of a fiduciary.

121.     Defendants breached their fiduciary duties to Plaintiff and the DOE Borrower Subclass Members by, without limitation, failing to review, interpret, establish procedures for, and comply with regulations and the standard of care and diligence of a fiduciary in arranging,

Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 32 of 39

administering, and handling Plaintiff's and the Class Members' student loans and financial assistance.

122.    Plaintiff and the DOE Borrower Subclass Members justifiably relied on Defendants to meet the standard of care and diligence of a fiduciary, and as a direct and proximate result of Defendants' acts and omissions, Plaintiff and the DOE Borrower Subclass Members have suffered actual injury-in-fact and damages, including but not limited to, monetary loss in connection with borrowing student loans and purchases of an education program and related products and services they would not have borrowed for or purchased absent Defendants' concealment, fraudulent omissions, and non-disclosures, or would not have paid as much for. They have suffered economic damages, including incurring student loans and paying education related costs, expenses, and charges they would not have otherwise incurred and paid.

123.    Accordingly, Plaintiff and the DOE Borrower Subclass Members are entitled to, and hereby seek, actual damages, punitive damages, treble damages, reasonable attorneys' fees and costs, and any and all further equitable relief that this Court deems appropriate.

124.    Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the DOE Borrower Subclass Members' claims are within any applicable statutes of limitations.

## COUNT VI
### Conversion
**(On Behalf of Plaintiff and the DOE Borrower Subclass)**

125.    Plaintiff and the DOE Borrower Subclass Members incorporate the above allegations as if fully set forth herein.

126.    Plaintiff and the DOE Borrower Subclass Members are the lawful owners of the student loan proceeds and other monies lent to and borrowed by them in the form of student loans from the U.S. Treasury and administered by the federal government's Department of Education.

127.    The student loan proceeds were paid directly to DeVry for Plaintiff's and each DOE Borrower Subclass Member's account and benefit. As a result of Defendants' wrongful conduct, which includes their willful collection and receipt of student loan proceeds paid for Plaintiff's and the DOE Borrower Subclass' benefit, Defendants have interfered with and converted Plaintiff's and the DOE Borrower Subclass' ownership interest in, or right to possess, such student loan proceeds.

128.    The student loan proceeds Defendants misappropriated are in a specific sum capable of identification. Plaintiff and the DOE Borrower Subclass Members have been damaged by Defendants' conversion.

129.    Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members' claims are within any applicable statutes of limitations, including the five-year statute of limitations for conversion.

## COUNT VII
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

130.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

131.    Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and such retention is unjust.

34

The elements of unjust enrichment may be established without reference to a separate underlying claim in tort or statute.

132.　Defendants received significant revenues from tuition paid by Plaintiff and the Class Members. Defendants appreciate and have knowledge of such benefits.

133.　Defendants' acceptance and retention of these benefits is due to their unlawful and improper conduct as set forth herein sounding in tort or statute, circumstances that make it inequitable for Defendants to retain the benefits Plaintiff and the Class paid to Defendants.

134.　Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiff and the Class while failing to have provided them with complete and truthful information regarding the 90% Placement and Higher Income Claims.

135.　Plaintiff and the Class Members received less than what they paid for in that the 90% Placement and Higher Income Claims were not true and the DeVry education program was not delivered as promised. Had Plaintiff and the Class Members known about the misrepresentations and the true placement rate and income rate, they would not have purchased the education program or any products or services from Defendants, or would have paid significantly less for them.

136.　As a proximate consequence of Defendants' improper conduct, the Plaintiff and the Class Members were injured. Accordingly, Plaintiff and the Class Members seek restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

137.　Neither Plaintiff nor the Class Members did discover, or could have discovered with any amount of reasonable diligence, the true facts regarding DeVry's false misrepresentations until January 27, 2016, when the FTC Lawsuit was filed. Therefore, Plaintiff's and the Class Members'

Case 4:19-cv-00250-ODS　Document 1　Filed 03/29/19　Page 35 of 39
*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

claims are within any applicable statutes of limitations, including the five-year statute of limitations for unjust enrichment.

## COUNT VIII
### Declaratory Relief
### (On Behalf of Plaintiff and the Class)

138.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

139.    A court may make binding declarations of the construction of any statutes, and a declaration of the rights of the parties interested by means of a pleading seeking that relief alone or as incident to or part of a complaint. Mo. Ann. Stat. § 527.010.

140.    Additionally, Defendants acted or refused to act on grounds that apply generally to the Class, so that final declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23(b)(2).

141.    Plaintiff and the Class Members are at a heightened and imminent risk of being financially unable to repay, and in default of, their student loans resulting from Defendants' wrongful and unlawful conduct. Interest on student loans continues to accrue every day, whether such loans are in forbearance or default or not.

142.    Plaintiff and the Class Members are suffering actual and imminent harm that is concrete and ongoing with each passing day of interest. An actual controversy and dispute between Plaintiff and the other Class Members and Defendants exists, and the parties have genuine, direct, and substantial opposing interests for which a judicial determination will be final and conclusive.

143.    Plaintiff and the Student Class Members who took out student loans have a defense against repayment of such loans in any action to collect such loans based on any act or omission of Defendants that would give rise to a cause of action against Defendants under applicable State law. 34 CFR 685.206(c)(1), (2).

144.     To the extent Plaintiff and the Student Class Members are relieved of repayment obligations for student loans based on violations of applicable state law, Defendants are subject to payment of the amount of the loan to which the defense applied. 34 CFR 685.206(c)(3).

145.     Plaintiff seeks a declaration that Defendants' acts and omissions as alleged herein violate applicable State law, including without limitation the MMPA, as well as such other and further relief as may follow from the entry of such a judgment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brown, individually and on behalf of the proposed Class, requests the Court:

A.     Certify this case as a class action on behalf of the Classes defined above, appoint Robby Brown as class representative, and appoint Edelson PC and the Law Office of Robert L. Teel as class counsel;

B.     Declare that Defendants are financially responsible for notifying all Class Members of the false and untrue nature of the 90% Placement Claim and Higher Income Claims in connection with marketing, advertising, promotion, and sale of DeVry's products and services;

C.     Award declaratory and other equitable relief, including rescission, as is necessary to protect the interests of Plaintiff and the Class Members;

D.     Enter an award in favor of Plaintiff and the Class that includes compensatory, exemplary or punitive damages, and statutory damages, including interest thereon, in an amount to be proven at trial;

E.     Award restitution and damages to Plaintiff and the Class Members in an amount to be determined at trial;

F.     Order disgorgement of Defendants' unjustly acquired revenue, profits, and other benefits resulting from their unlawful conduct for the benefit of Plaintiff and the Class Members in an equitable and efficient manner determined by the Court;

G.     Order the imposition of a constructive trust upon Defendant such that its enrichment, benefit, and ill-gotten gains may be allocated and distributed equitably by the Court to and for the benefit of Plaintiff and the Class Members.

H.     Enter an award of attorneys' fees and costs, as allowed by law;

I.     Enter an award of pre-judgment and post-judgment interest, as provided by law;

J.     Grant Plaintiff and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

K.     Grant such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

*Brown v. Adtalem Global Education, Inc., et al.*
CLASS ACTION COMPLAINT

**ROBBY BROWN**, individually and on behalf of all others similarly situated,

Dated: March 29, 2019

By: _/s/ Bill Kenney_
 One of Plaintiff's Attorneys

Benjamin H. Richman*
*brichman@edelson.com*
Sydney M. Janzen*
*sjanzen@edelson.com*
Michael Ovca*
*movca@edelson.com*
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Robert L. Teel*
*lawoffice@rteel.com*
LAW OFFICE OF ROBERT L. TEEL
1425 Broadway, Mail Code: 20-6690
Seattle, Washington 98122
Tel: 866.833.5529
Fax: 855.609.6911

William C. Kenney Mo. Bar No. 63001
BILL KENNEY LAW FIRM, LLC
1100 Main Street, Suite 1800
Kansas City, MO 64105
Telephone: (816) 842-2455
Facsimile: (816) 474-8899
Email: *bkenney@billkenneylaw.com*

\*Pro hac vice admission to be sought.

Case 4:19-cv-00250-ODS   Document 1   Filed 03/29/19   Page 39 of 39